[965 NE2d 246, 942 NYS2d 19]

EASTSIDE EXHIBITION CORP., Appellant, v 210 EAST 86TH STREET CORP., Respondent.

Argued January 10, 2012; decided February 21, 2012

**POINTS OF COUNSEL**

*Marcus Rosenberg & Diamond LLP*, New York City (*David Rosenberg* of counsel), for appellant. I. There is no basis to depart from this Court's centuries' old rule that a landlord's partial actual eviction of its tenant suspends the tenant's entire rent. (*Dyett v Pendleton*, 8 Cow 727; *Lewis v Payn*, 4 Wend 423; *Christopher v Austin*, 11 NY 216; *Edgerton v Page*, 20 NY 281; *Fifth Ave. Bldg. Co. v Kernochan*, 221 NY 370; *Matter of Wallace v 600 Partners Co.*, 86 NY2d 543; *TAG 380, LLC v ComMet 380, Inc.*, 10 NY3d 507; *South Rd. Assoc., LLC v International Bus. Machs. Corp.*, 4 NY3d 272; *Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470; *Maxton Bldrs. v Lo Galbo*, 68 NY2d 373.) II. Stare decisis, a foundation of our common-law system, fundamental to real property law, must be respected. (*Barash v Pennsylvania Term. Real Estate Corp.*, 26 NY2d 77; *People v Taylor*, 9 NY3d 129; *People v Hobson*, 39 NY2d 479; *Paragon Indus. v Williams*, 122 Misc 2d 628; *Holy Props. v Cole Prods.*, 87 NY2d 130; *Maxton Bldrs. v Lo Galbo*, 68 NY2d 373; *Eastern Consol. Props. v Adelaide Realty Corp.*, 95 NY2d 785; *Douglaston Manor v Bahrakis*, 89 NY2d 472; *City of Buffalo v Cargill, Inc.*, 44 NY2d 7.) III. There was no basis for the holding that the floor-to-ceiling steel cross-bracing may remain,

effectively enjoining tenant to suffer it. (*I. H. P. Corp. v 210 Cent. Park S. Corp.*, 16 AD2d 461; *Bianchi v Hood*, 128 AD2d 1007.) IV. Law of the case is not absolute and does not "trump" stare decisis. (*People v Palumbo*, 53 NY2d 894; *Aridas v Caserta*, 41 NY2d 1059; *Liss v Trans Auto Sys.*, 68 NY2d 15; *People v Taylor*, 87 AD2d 771, 57 NY2d 729.)

*Kaufman Friedman Plotnicki & Grun, LLP*, New York City (*Howard Grun* of counsel), for respondent. I. The doctrine of actual eviction has always required a substantial intrusion by a landlord into a tenant's premises which significantly and negatively impacts upon a tenant's use of its premises so as to trigger the imposition of the draconian remedy of a full rent abatement. (*Lounsbery v Snyder*, 31 NY 514; *Two Rector St. Corp. v Bein*, 226 App Div 73; *Barash v Pennsylvania Term. Real Estate Corp.*, 26 NY2d 77; *Huber v Ryan*, 26 Misc 428; *Bergman v Papia*, 58 Misc 533; *Brown v Kaufman*, 188 Misc 1025; *Two Park Ave. Co. v Intermediate Factors Corp.*, 17 Misc 2d 442; *Two Tudor City Place v Joseph*, 17 Misc 2d 870; *Fifth Ave. Estates v Scull*, 42 Misc 2d 1052; *Edgerton v Page*, 20 NY 281.) II. The Appellate Division's approach is equitable and in line with modern realities. (*Javins v First Natl. Realty Corp.*, 428 F2d 1071; *Kavanaugh v Cohoes Power & Light Corp.*, 114 Misc 590; *Minjak Co. v Randolph*, 140 AD2d 245; *Manhattan Mansions v Moe's Pizza*, 149 Misc 2d 43; *Edgerton v Page*, 20 NY 281.) III. Appellant failed to prove that it incurred any damages as a result of respondent's minimal taking. (*F.H. Krear & Co. v Nineteen Named Trustees*, 810 F2d 1250; *Cochran v A/H Battery Assoc.*, 909 F Supp 911; *Randall-Smith v 43rd St. Estates Corp.*, 17 NY2d 99; *Peerless Candy Co., Inc. v Halbreich*, 125 Misc 889; *Appliance Giant, Inc. v Columbia 90 Assoc., LLC*, 8 AD3d 932; *487 Elmwood v Hassett*, 107 AD2d 285; *Frame v Horizons Wine & Cheese*, 95 AD2d 514.)

## OPINION OF THE COURT

CIPARICK, J.

In this appeal, we are asked to consider whether a minimal and inconsequential retaking of space that has been leased to a commercial tenant constitutes an actual partial eviction relieving the tenant from all obligation to pay rent. We conclude, under the circumstances of this case, where such interference by a landlord is small and has no demonstrable effect on the tenant's use and enjoyment of the space, total rent abatement is not warranted.

## I.

In February 1998, plaintiff Eastside Exhibition Corp. entered into a lease with defendant 210 East 86th Street Corp. to occupy two floors in defendant's seven-story retail and office building to operate a multiplex movie theater with 1,150 seats and four screens. The lease ran from March 1, 1998 to December 16, 2016. Article 13 of the lease permits the landlord to enter the demised premises to make repairs and improvements and provides that there be no abatement of rent during the time such work is in progress. Article 4 of the lease provides that there be no allowance to the tenant for the diminution of rental value arising from the making of any repairs or improvements.

More than nine years ago, in December 2002, defendant landlord, without giving notice to or receiving permission from plaintiff, entered the demised premises and installed cross-bracing between two existing steel support columns on both of plaintiff's leased floors causing a change in the flow of patron foot traffic on the first floor and a slight diminution of the second-floor waiting area. The concededly unaesthetic cross-bracing was placed in preparation for the addition of two additional floors to the building. Plaintiff ceased paying rent as a remedy for the alleged actual partial eviction and commenced this action, seeking a permanent injunction barring defendant from doing any further work in the premises and directing defendant to remove the cross-bracing. Plaintiff also sought an abatement of its rent obligation.[1] Supreme Court granted plaintiff a temporary restraining order on any further work by defendant and also ordered defendant to expeditiously complete the current work. Subsequently, a nonjury trial was held to determine whether the cross-bracing constituted an actual partial eviction so as to allow for the complete abatement of rent. At trial, the parties stipulated that the total area of the premises was between 15,000 and 19,000 square feet and that the cross-bracing occupied approximately 12 square feet.

---

1. Additionally, plaintiff requested compensatory damages in the amount of $1 million and punitive damages in the amount of $3 million. The landlord thereafter served the tenant with a Notice to Cure Default for failing to provide landlord with its books and records, failing to install a neutralization tank for spilled soda, installing new doors on the second floor theaters that did not comply with the building code and several other items. These additional claims are not a part of this appeal.

Supreme Court, as relevant here, dismissed plaintiff's claim and entered judgment for defendant for unpaid rent. In its decision, the court stated that although the lease did not grant the landlord the right to permanently deprive the tenant of any portion of the demised premises and that such a deprivation will normally result in "liability for all rent [being] suspended although the tenant remains in possession of the portion of the premises from which he was not evicted" (quoting *Barash v Pennsylvania Term. Real Estate Corp.*, 26 NY2d 77, 83 [1970]), here, the taking of 12 square feet of non-essential space in plaintiff's lobby constituted a de minimis taking not justifying a full rent abatement.[2]

The Appellate Division modified on the law, holding that there is no de minimis exception to the rule that any unauthorized taking of the demised premises by the landlord constitutes an actual eviction (*see Eastside Exhibition Corp. v 210 E. 86th St. Corp.*, 23 AD3d 100, 104-105 [1st Dept 2005]). However, the court declined to award plaintiff a full rent abatement, stating that "current landlord/tenant realities [make it] particularly untoward automatically to apply harsh and oppressive strictures derived from feudal law that mirror the policies and concerns of that earlier society" and that in light of that, the remedy is to compensate plaintiff for its actual damages (*id.* at 105). The Appellate Division remanded the matter to Supreme Court for a hearing to determine actual damages (*see id.*).

The hearing on damages was held three years later. Plaintiff proffered two witnesses, who were unable or unwilling to estimate actual damages, essentially testifying that damages were impossible to determine given the significant number of variables in the motion picture theater industry. After the hearing, Supreme Court found that plaintiff failed to establish any damages and made no award to plaintiff. The Appellate Division

---

2. For this determination the court cited *Cut-Outs, Inc. v Man Yun Real Estate Corp.* (286 AD2d 258, 260 [1st Dept 2001], *lv denied* 100 NY2d 507 [2003] ["plaintiff failed to prove that this encroachment constituted anything more than a de minimis taking of inessential space"]); *Camatron Sewing Mach. v Ring Assoc.* (179 AD2d 165, 168 [1st Dept 1992] ["contrary to defendants' argument, the contemplated taking is not de minimis; it constitutes 25% of the 201.5 square feet store space used for its administrative office"]); and *Paine & Chriscott v Blair House Assoc.* (70 AD2d 571, 572 [1st Dept 1979] ["The space used by the pipes and conduits occupies .5% of the total square footage of the leased premises. To the extent that the pipes and conduits might constitute a partial eviction, this can easily be compensated by money damages"]).

affirmed, declining to revisit legal issues as it felt bound by the law of the case as earlier expressed in the first Appellate Division order (*see Eastside Exhibition Corp. v 210 E. 86th St. Corp.*, 79 AD3d 417, 418 [1st Dept 2010]). We granted plaintiff leave to appeal (16 NY3d 708 [2011]) and now affirm on different grounds.

## II.

It is well settled that the withholding of the entire amount of rent is the proper remedy when there has been a partial eviction by a landlord (*see Fifth Ave. Bldg. Co. v Kernochan*, 221 NY 370, 372-373 [1917] ["Eviction . . . suspends the obligation of payment . . . because it involves a failure of the consideration for which rent is paid . . . If such an eviction, though partial only, is the act of the landlord, it suspends the entire rent because the landlord is not permitted to apportion his own wrong"]). "The reason of the rule is, that the tenant has been deprived of the enjoyment of the demised premises by the wrongful act of the landlord; and thus the consideration of his agreement to pay rent has failed" (*Edgerton v Page*, 20 NY 281, 284 [1859]). This is true even if a tenant remains in possession of the premises (*see Barash*, 26 NY2d at 83). This remedy of total abatement of rent for an actual partial eviction is one of very long standing in New York (*see Dyett v Pendleton*, 8 Cow 727 [NY Sup Ct 1826]) and we do not, herein, jettison or overrule it as stated by the dissent (*see* dissenting op at 631-632).

The question we now address is whether there can be an intrusion on the demised premises that is of such trifling amount that imposition of the draconian remedy of total rent abatement is unjustified. We made it clear in *Lounsbery v Snyder* (31 NY 514, 516-517 [1865]) that not every intrusion amounts to an eviction which warrants a full rent abatement and damages are an appropriate remedy when there has been no substantial interference with the use of the premises. We further stated "[i]f it were necessary, [one] might properly invoke the application of the familiar maxim, '*de minimis non curat lex*' " (the law does not concern itself with trifles) (*id.* at 516).

Plaintiff would like us to adopt an all or nothing rule that would allow for full rent abatement. However, applying the principle that a "landlord is not permitted to apportion his own wrong" (*Fifth Ave. Bldg. Co.*, 221 NY at 373) and a rule that any minimal intrusion warrants a total abatement to a case

such as this, involving only a trivial taking, "has little but age and inertia to recommend it" (3 Randolph, Friedman on Leases § 29:2.4, at 29-15 [5th ed]). Scholars have criticized an all or nothing rule noting that it is "more talismanic than rational" (Stoebuck and Whitman, Law of Property § 6.32, at 284 [3d ed]). Additionally, courts in other jurisdictions have rejected such a harsh rule (*see Talbot v Citizens Natl. Bank of Evansville,* 389 F2d 207, 211 [7th Cir 1968] [holding that under Indiana law an encroachment on 5.45 feet of leased space does not rise to the level of an eviction because there was no "showing that the part of the demised premises from which (the tenant) was evicted was a material part or that the eviction was a material breach of the covenant of quiet enjoyment"]; *Dussin Inv. Co. v Bloxham,* 96 Cal App 3d 308, 317 [Ct of App, 4th Dist, Div 2 1979] ["a tenant is not relieved entirely of the obligation to pay rent by an actual, partial eviction unless the eviction is from a substantial portion of the premises and that in determining the question of substantiality, the court may and should consider the extent of the interference with the tenant's use and enjoyment of the property"]).

Given the inherent inequity of a full rent abatement under the circumstances presented here and modern realities that a commercial lessee is free to negotiate appropriate lease terms, we see no need to apply a rule, derived from feudal concepts, that any intrusion—no matter how small—on the demised premises must result in full rent abatement. Rather, we recognize that there can be an intrusion so minimal that it does not prescribe such a harsh remedy. For an intrusion to be considered an actual partial eviction it must interfere in some, more than trivial, manner with the tenant's use and enjoyment of the premises. That a partial eviction must intrude on the enjoyment of the demised premises was implicated early on in *Dyett* where the court noted that the tenant, having retained some portion of the premises, nonetheless was not required to pay for the part of the premises retained because there existed "such a disturbance, such an injury to its beneficial enjoyment, such a diminution of the consideration upon which the contract is founded, that the law refuses its aid to coerce the payment of any rent" (8 Cow at 731). Similarly, in *Edgerton,* we stated that "there must be an entry and expulsion of the tenant by the landlord, or some deliberate disturbance of the possession depriving the tenant of the beneficial enjoyment of the demised premises, to operate a suspension or extinguishment of the rent" (20 NY at 285).

While the dissent seems to view our holding as revolutionary and "schizophrenic" (dissenting op at 625 n 1), we regard it as nothing more than an application of the familiar de minimis principle which we have never held or suggested to be inapplicable to actual partial eviction cases. So far as we know, no cases actually granted a 100% rent abatement for a so called "eviction" as trivial as this one—a taking of less than one-tenth of one percent of the space, so located that its absence has no measurable effect on the tenant's use.

Thus we conclude that on the record before us plaintiff has totally failed to demonstrate any actual damages or loss of enjoyment of the premises due to the landlord's erection of the cross-bracing occupying 12 square feet in a 15,000 to 19,000 square foot space. That the flow of foot traffic was minimally impeded and the cross-bracing was unattractive was merely a trivial interference with the tenant's use and enjoyment of the premises. The interference by the landlord here is thus de minimis and "[n]either injunctive nor monetary relief is warranted" (*Wing Ming Props. [U.S.A.] v Mott Operating Corp.*, 79 NY2d 1021, 1023 [1992]).[3]

Accordingly, the order of the Appellate Division should be affirmed, with costs.

READ, J. (dissenting). The majority disapproves of the strict common-law "rule, derived from feudal concepts, that any intrusion—no matter how small—on the demised premises must result in full rent abatement" for two reasons: "inherent inequity" and "modern realities that a commercial lessee is free to negotiate appropriate lease terms" (majority op at 623). But as even a critic of what is often called the "one-inch rule" has recognized,

> "[i]t is one thing to conclude that a deliberate physical trespass should not be penalized with a draconian rent penalty, but it is quite another to conclude that it should be sanctioned by permitting the landlord to appropriate to itself space already leased

---

**3.** The dissent argues that we have "overruled an easy to understand, easy to apply bright-line rule in favor of a . . . rule that affords no predictability of outcome" (dissenting op at 631). We have, however, previously allowed for de minimis exceptions to bright-line rules in landlord/tenant cases (*see e.g. Park W. Mgt. Corp. v Mitchell*, 47 NY2d 316, 327-328 [1979] [finding that a violation of the housing code does not automatically constitute a breach of the warranty of habitability as a code violation may be de minimis having no impact on habitability]), and find it appropriate to do so here.

to [the] tenant, no matter how small. Such a finding is inconsistent with the traditional values the common law has placed upon the right of possession" (3 Randolph, Friedman on Leases § 29:2.4, at 29-15— 29-16 [2011]; *see* majority op at 623, quoting Professor Randolph's comment that the "one-inch rule" "has little but age and inertia to recommend it").

Unfortunately, this is where the law of New York has now been left—a tenant has no effective remedy if the landlord unilaterally takes back a portion of the leased premises during the lease term.[1]

And while it is true that a lessee may negotiate around the majority's new de minimis rule in the future, this is no consolation to plaintiff Eastside Exhibition Corp. (tenant) and the many other commercial lessees currently subject to long-term leases[2] entered into with the correct understanding that Judge Cardozo's decision in *Fifth Ave. Bldg. Co. v Kernochan* (221 NY 370 [1917]) stated New York law. Indeed, why was it not incumbent on defendant 210 East 86th Street Corp. (landlord) to negotiate an "appropriate lease term[ ]" (majority op at 623) if it did not want to be subject to the well established common-law rule? I respectfully dissent.

## I.

In *Kernochan*, the landlord leased to the tenant part of the first floor and basement of a Fifth Avenue building. By the terms of the lease, the basement included a vault beneath the

---

**1.** The majority opinion is schizophrenic: my colleagues criticize the common-law rule for being harsh and outmoded because a tenant may abate rent for an exclusion or expulsion "no matter how small" (majority op at 623), while at the same time declaring that the common-law rule, in fact, mirabile dictu, never suspended the tenant's obligation to pay rent where the unauthorized taking was "of such trifling amount that . . . the draconian remedy of total rent abatement [was] unjustified," and did not "interfere in some, more than trivial, manner with the tenant's use and enjoyment of the premises" (majority op at 622, 623). Put another way, in the majority's view the common law has always sanctioned total rent abatement as a remedy for *any* unauthorized taking no matter *how* small—so long as not *too* small. This is, at the very least, confusing, if not downright contradictory. Of course, the majority's formulation creates the rhetorical fig leaf by which my colleagues deny overruling our long-standing jurisprudence governing partial actual eviction.

**2.** The lease in this case, for example, has a term of 18 years, 9 months and 16 days: it commenced on March 1, 1998 and is set to expire on December 16, 2016. Landlord entered the premises to install the floor-to-ceiling steel cross-bracing in December 2002—i.e., about a quarter of the way through the lease term.

sidewalk in front of the building. The vault was maintained under a revocable license from the city. During the lease's term, the city revoked the license and excluded the tenant from at first the whole vault and later from a part of it for purposes of building the subway. Judge Cardozo emphasized that, under these facts,

> "[w]e are dealing . . . with an eviction which is actual and not constructive. If such an eviction, though partial only, is the act of the landlord, it suspends the entire rent because the landlord is not permitted to apportion his own wrong. If the eviction is the act of a stranger by force of paramount title, the rent will be apportioned, and a recovery permitted for the value of the land retained" (*id.* at 373).

A half-century after *Kernochan*, Judge Breitel in *Barash v Pennsylvania Term. Real Estate Corp.* (26 NY2d 77 [1970]) reiterated that "[i]n the case of actual eviction, even where the tenant is only partially evicted, liability for all rent is suspended although the tenant remains in possession of the portion of the premises from which he was not evicted" (*id.* at 83 [citing *Kernochan*, 221 NY at 373]).

Thus, we have long held that full abatement of rent is the remedy where the landlord physically expels or excludes the tenant from any portion of the leased premises (*see e.g.* Friedman on Leases at 29-15 [noting that "no less an authority" than Judge Cardozo has endorsed the "one-inch rule," citing *Kernochan*]). My colleagues have nonetheless now discovered in *Lounsbery v Snyder* (31 NY 514 [1865])—a case decided 52 years before *Kernochan*—an implied de minimis exception for intrusions that are trifling in amount and no more than trivial in effect.

But *Lounsbery* was a trespass case where the landlord did not permanently intrude on the leased premises. Pursuant to an oral rent reduction agreement reached by the parties in April 1857, the tenants allowed the landlord to resume partial occupancy and to deposit firewood temporarily on a lot where a store was located, which the tenants retained. In January or February of 1858, one of the tenants forbade the landlord from continuing to keep firewood there, but the landlord "paid no heed" (31 NY at 515). When the landlord subsequently sued the tenants for unpaid rent (as reduced under the oral agreement), they "claimed that the exercise by [the landlord] of the privilege

of piling his firewood on part of the store lot, after notice to discontinue the practice, was equivalent to an eviction" (*id.*).

We said that the presence of the firewood on the property "at most" demonstrated "a mere trespass, and amounted neither to an actual nor a constructive eviction" because "[t]o work a suspension of the obligations of the tenant . . . there must be *an exclusion of the occupant from some portion of the premises demised"*—i.e., a partial actual eviction—"or a substantial and effectual deprivation of the beneficial enjoyment of the property in whole or in part"—i.e., a constructive eviction (*id.* at 515-516 [emphasis added]; *see also id.* at 516 ["(I)t is well settled that the wrongful acts of a lessor do not, in law, amount to an eviction, where there is neither an actual nor a constructive expulsion of the lessee from any portion of the premises demised"]). The trespass in *Lounsbery*—stockpiled firewood—obviously did not permanently exclude or expel the tenant from any portion of the leased property, unlike the cross-bracing fitted into the theater lobby by landlord in this case. In sum, in *Lounsbery,* there was *no* exclusion or expulsion, not merely a de minimis one.

My colleagues' interpretation of the common law, as articulated by Judge Cardozo in *Kernochan*, is unique so far as I have been able to discover: the traditional rule is, after all, referred to as the "one-inch rule" in recognition of its absolute nature. And its absolute nature is both the source of the criticism of it and the mainspring of its deterrent effect. In particular, the degree of the landlord's interference with a tenant's use and enjoyment of the premises has heretofore only been seen as important in the case of constructive eviction, not actual eviction.

As Judge Breitel explained in *Barash*, "[a]n actual eviction occurs only when the landlord wrongfully ousts the tenant from physical possession of the leased premises. There must be a physical expulsion or exclusion" (26 NY2d at 82-83 [citing *Kernochan*]). Contrariwise,

> "constructive eviction exists where, although there has been *no physical expulsion or exclusion* of the tenant, the landlord's acts *substantially and materially deprive the tenant of the beneficial use and enjoyment of the premises*. The tenant, however, must abandon possession in order to claim that there was a constructive eviction" (*id.* at 83 [citations omitted and emphases added]).

In other words, where (and *because*) there has been no physical ouster, the tenant must show a substantial and material deprivation of its beneficial use and enjoyment of the premises (and, in addition, relinquish possession) in order to establish constructive eviction, which relieves the tenant of the obligation to pay rent. But in the case of an actual eviction, even if only partial, a deprivation of beneficial use and enjoyment occurs by virtue of the physical expulsion or exclusion.

The majority conflates actual and constructive eviction when stating that "[f]or an intrusion to be considered an actual partial eviction it must interfere in some, more than trivial, manner with the tenant's use and enjoyment of the premises" (majority op at 623), relying on *Dyett v Pendleton* (8 Cow 727 [1826]) and *Edgerton v Page* (20 NY 281 [1859]). *Dyett* is famous for establishing the doctrine of (and coining the phrase) constructive eviction, while *Edgerton* held that abandonment was a prerequisite to constructive eviction (*see* Weinberg, *From Contract to Conveyance: The Law of Landlord and Tenant, 1800-1920 [Part 1]*, 5 S Ill U LJ 29, 66-82 [1980]). We developed the doctrine of constructive eviction by analogy to and in contrast with partial actual eviction, which is therefore discussed in both cases.

In the majority's view, *Dyett* and *Edgerton* establish that "early on" we held that a "partial [actual] eviction must intrude on the [tenant's] enjoyment of the demised premises" (majority op at 623), apparently meaning that the tenant's use and enjoyment of the leased property must be impaired in some way beyond the mere fact of a physical expulsion or exclusion. This is not correct, as is demonstrated by the passages from these cases recited by the majority.

When discussing partial actual eviction in *Dyett*, we stated that

> "a tenant shall not be required to pay rent, even for the part of the premises which he retains, if he has been evicted from the other part by the landlord. As to the part retained, this [meaning the physical expulsion or exclusion] *is deemed* such a disturbance, such an injury to its beneficial enjoyment, such a diminution of the consideration upon which the contract is founded, that the law refuses its aid to coerce the payment of any rent" (8 Cow at 731 [emphasis added]).

Concomitantly, in *Edgerton*, we observed that "there must be

an entry and expulsion of the tenant by the landlord[ ]"—referring to an actual eviction, in whole or in part—"or some deliberate disturbance of the possession depriving the tenant of the beneficial enjoyment of the demised premises[ ]"—referring to a constructive eviction—"to operate a suspension or extinguishment of the rent" (20 NY at 285). In short, a physical expulsion or exclusion is, by definition, nontrivial.

## II.

Applying the new de minimis rule to the facts of this case, the majority holds that tenant has not shown that the unauthorized taking was more than trifling in amount and trivial in effect, as a matter of law, because landlord appropriated "less than one-tenth of one percent of the [total leased] space, so located that its absence has no measurable effect on the tenant's use" (majority op at 624). Put slightly differently, although the steel cross-bracing "minimally impeded" foot traffic in the lobby and was "unattractive," it entailed "merely a trivial interference with the tenant's use and enjoyment of the premises" (id.).[3]

Notably, though, the lease called for tenant to pay landlord $2.75 million to convert the leased premises into a "quad," or two-story movie theater with four separate theaters, in accordance with architectural drawings and a work schedule incorporated by reference in the lease's exhibits. The "quad" plans show a first-floor lobby that is roughly 15 feet wide (east-west) and 40 feet long (north-south), with two one-foot square support columns or pillars in the center, 20 feet apart. But after landlord installed the cross-bracing (and railings required as a consequence), the distance between the columns was reduced from 20 feet to 8 feet—i.e., the 15-foot-wide lobby is now bisected by two structures akin to freestanding walls, each six feet long and one foot wide. This is considerably different from what tenant bargained for in the lease, and paid landlord to construct. I would not characterize landlord's unwanted remaking of the lobby as trifling in amount or trivial in effect—obviously, tenant entered into a long-term lease specifying something quite different to the tune of $2.75 million.

Finally, even if there were, under the new de minimis rule, no partial actual eviction in this case, there was (and still is) a

---

3. Tenant emphasized the intrusion in the lobby, although the cross-bracing took away another 12 square feet from an informal seating area on the theater's second floor. Landlord installed the cross-bracing to support two additional stories, allowing increased rental income of an estimated $1 million a year.

trespass. And unlike the situation in *Lounsbery*, the trespass is permanent in nature rather than transitory. The majority brushes this aside with the comment that the trespass is de minimis, too, citing only our memorandum decision in *Wing Ming Props. (U.S.A.) v Mott Operating Corp.* (79 NY2d 1021 [1992]), a case that did not involve a lease or a trespass by a landlord. In any event, as Professor Randolph pointed out, "permitting the landlord to appropriate to itself space already leased to [the] tenant, no matter how small . . . is inconsistent with the traditional values the common law has placed upon the right of possession" (Friedman on Leases at 29-16).[4] Do we really want to say that a commercial tenant has no remedy whatsoever under New York law when a landlord usurps a portion of the leased premises so long as the tenant can still conduct its business despite the intrusion?

## III.

Landlord and tenant are sophisticated commercial actors who executed a lease consisting of a six-page form, with deletions and two pages of insertions, and a 73-page rider, including exhibits. Throughout this lease, they delineated whether or to what extent rent abatement was an available remedy in particular potential instances of eviction.

The parties sometimes expressly agreed that tenant could *not* abate rent. For example, the lease permits landlord to enter the premises to make necessary repairs, replacements and improvements; in doing so, landlord may "take all nec[essary] materials and equipment into said premises without the same constitut-[ing] eviction nor shall the Tenant be entitled to any abatement of rent whil[e] work is in progress." Similarly, tenant is not entitled to rent abatement for scaffolding in front of the premises during repairs.

In other places, the lease endorses rent abatement, but sets up a method for calculating the proper amount. For example, if landlord fails to meet "material repair obligations," tenant agrees to accept a rent abatement "pro-rated based upon the area of the Premises which shall be unusable" and only when landlord's breach renders at least 25% of the premises' total area unusable. In exchange, the lease provides that where

---

4. In his view, the lower court erred by not continuing injunctive relief (Friedman on Leases at 29-16). Landlord apparently represented to Supreme Court that it would be feasible to remove the cross-bracing later if necessary (*see* 23 AD3d 100, 102 [1st Dept 2005]).

tenant notifies landlord of the problem and landlord fails to make these material repairs within one day, tenant may elect to "perform such repairs to the extent necessary to resume . . . normal movie theatre operations and [receive] reimbursement from Owner for . . . actual, reasonable, out-of-pocket costs."

Finally, the parties agreed that if any of the premises' vault space was revoked or diminished by a governmental authority or public utility, landlord "shall not [be s]ubject to any liability nor shall Tenant be entitled to any . . . [d]iminution or abatement of rent, nor shall such revocation, diminution [or r]equisition be deemed constructive or actual eviction." In other words, landlord and tenant negotiated a provision that supplants the otherwise applicable rule prescribed by *Kernochan* in this circumstance—i.e., that where "the act of a stranger by force of paramount title" causes an actual partial eviction, "the rent [would] be apportioned, and a recovery permitted for the value of the land retained" (221 NY at 373). The parties did not, however, negotiate an alternative to the common-law rule governing a partial actual eviction by act of the landlord, although they were clearly free to do so. If landlord was "dissatisfied with the rule of [*Kernochan*], the time to say so [was] at the bargaining table" (*Maxton Bldrs. v Lo Galbo*, 68 NY2d 373, 382 [1986]).

## IV.

The majority has overruled an easy to understand, easy to apply bright-line rule in favor of a new de minimis rule that affords no predictability of outcome. Under *Kernochan*, it was very risky for a landlord to intrude on leased space in disregard of the tenant's right to the whole of the property because the tenant might withhold rent. Now it is very risky for a tenant to withhold rent where the landlord wrongfully appropriates any portion of the leased premises because it is left up to the courts to determine whether the ouster is merely trifling in amount and trivial in effect. This determination will inevitably require expensive, protracted litigation with an uncertain resolution (*cf. Park W. Mgt. Corp. v Mitchell*, 47 NY2d 316, 324 [1979] [constructive eviction is a remedy "fraught with uncertainty" in part because "the reasonableness of the tenant's action (is) subject to the vicissitudes of judicial review"]; *see also* Warren A. Estis and William J. Robbins, *Actual Partial Evictions*, NYLJ, Oct. 5, 2005, at 31,

col 5 [the Appellate Division "in effect create(d) a de minimis exception to the *Barash* rule" in this case by creating a damages remedy, thereby posing the "question . . . whether this decision opens the (flood)gates for landlords to take space from tenants, leaving it to the courts to determine whether the taking was merely de minimis"]; 7-82 Warren's Weed, New York Real Property § 82.22 [1] [2011] [the Appellate Division's decision, which rejected "(t)he former rule announced by (Judge) Cardozo in *(Kernochan)*," has "raised considerable consternation in the landlord-tenant bar"]). At least until tenants have the opportunity to negotiate lease terms that account for the change in the law, they have no effective way to combat unauthorized takings by landlords.

We have always emphasized that stare decisis is especially important in cases involving contracts and property rights because

> "[p]arties who engage in transactions based on prevailing law must be able to rely on the stability of such precedents. In business transactions, particularly, the certainty of settled rules is often more important than whether the established rule is better than another or even whether it is the 'correct' rule. This is perhaps true in real property more than any other area of the law, where established precedents are not lightly to be set aside" *(Holy Props. v Cole Prods.*, 87 NY2d 130, 134 [1995], citing *Maxton*, 68 NY2d at 381; *Eastern Consol. Props. v Adelaide Realty Corp.*, 95 NY2d 785, 788 [2000, Kaye, Ch. J., concurring] ["Stare decisis should be most stringently applied in cases involving contract and property rights. Indeed, considerations favoring stare decisis are at their acme in those cases"] [internal quotation marks omitted]).

Whatever the wisdom of casting *Kernochan* aside, the new de minimis rule should not apply in this case or, for that matter, to any litigation arising out of commercial leases entered into *before* today's decision. Tenant, which justifiably relied on clear and long-standing New York law, now faces the prospect of paying landlord nine years' worth of rent (perhaps escrowed, perhaps not), presumably along with 9% interest, as a consequence of its confidence in our fidelity to the "certainty of settled rules" governing property rights *(Holy Props.*, 87 NY2d at 134). Additionally, the "concededly

unaesthetic cross-bracing" (see majority op at 620), which creates the unbargained-for eyesore and obstruction, remains in place in the middle of the theater's 15-foot-wide lobby.

We acknowledged in *Gager v White* (53 NY2d 475, 483-484 [1981]) that "when adherence to the traditional course" of applying a change in decisional law retrospectively is "strongly contra-indicated by powerful factors, including *strong elements of reliance on law superseded by the new pronouncement*, a court may direct that it operate prospectively alone" (emphasis added). This is surely the unusual case "where there has been such a sharp break in the continuity of law" that "retroactive application should be eschewed" (*id.* at 483-484).

Chief Judge LIPPMAN and Judges GRAFFEO, SMITH, PIGOTT and JONES concur with Judge CIPARICK; Judge READ dissents in a separate opinion.

Order affirmed, with costs.